IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SUNTIGER, INC., d/b/a EAGLE EYES OPTICS, a California corporation,

Plaintiff,

vs.

ESSILORLUXOTTICA, S.A., a foreign company, d/b/a THE ESSILORLUXOTTICA GROUP, and FGX INTERNATIONAL, INC., a Delaware Corporation.

Defendant.

**DEMAND FOR JURY TRIAL**

Case No.:

## PLAINTIFF'S COMPLAINT

Plaintiff SunTiger, Inc. d/b/a "Eagle Eyes Optics" files this Complaint for (a) Lanham Act Violations, (b) Breach of Contract and Implied Covenant of Good Faith and Fair Dealing, and (c) Unfair Competition, against Defendants EssilorLuxottica, S.A. d/b/a "the EssilorLuxottica Group," and FGX International, Inc. (collectively, "the Defendants").

## THE PARTIES

1. Plaintiff SunTiger, Inc., ("Plaintiff" or "SunTiger") doing business as Eagle Eyes Optics is a California corporation with its principal place of business located at 23945 Calabasas Road, Suite 201, Calabasas, California, 91302. SunTiger conducts substantial and not isolated business in the State of

Florida and specifically in this District through direct sales of its sunglasses from its web sites.

2. Defendant EssilorLuxottica S.A. ("EssilorLuxottica S.A." or "S.A."), doing business as "the EssilorLuxottica Group" ("*the Group*"), has its corporate headquarters at 147 Rue de Paris, 94220 Charenton-le-Pont, France, and is a multinational, vertically integrated, publicly traded company formed under French law, doing extensive business in the United States, including substantial and not isolated business in the State of Florida and specifically in this District. The Group has its own series of web pages at https://www.essilorluxottica.com/en/group/. The Group is a single, vertically integrated enterprise that brings together frames and lenses under one roof by the power of vertical integration.[1]

[1] https://www.essilorluxottica.com/en/governance/simplified-corporate-chart/. (Emphasis added).




3. Defendant FGX International, Inc. ("FGX") is a Delaware corporation with its principal place of business located at 500 George Washington Highway, Smithfield, RI 02917. FGX is "an EssilorLuxottica company" and became part of the Group through acquisition in March 2010, when Essilor (a predecessor to EssilorLuxottica S.A.) purchased the company to expand into sunglasses. Subsequently, Essilor merged with Luxottica in 2018 to form EssilorLuxottica S.A., integrating FGX into the Group as part of its vertically integrated structure. FGX conducts substantial and not isolated

business in the State of Florida and specifically in this District, including sales of its "broad portfolio of owned and licensed brands" online and in retail stores.[2]

4. The Group's extensive portfolio of brands[3] of sunglasses that it makes and sells include, *inter alia*, "Ray-Ban," "Costa" (a/k/a "Costa Del Mar"), and Foster Grant, which are each sold widely in this District in retail stores[4] as well as online.

5. Maps showing extensive retail locations for the Group's stores in this District are reproduced below (with annotations) from the Ray-Ban[5], Costa Del Mar[6], and Foster Grant[7] web sites.

[2] https://www.fgxi.com/about-us/; https://www.fgxi.com/brands/.
[3] https://www.essilorluxottica.com/en/brands/eyewear/.
[4] The Group is a world leader in the optical retail business and includes everything from frame and lens manufacturers, distributors, online sellers, and about 18,000 retail stores worldwide. https://www.essilorluxottica.com/en/group/.
[5] https://www.ray-ban.com/usa/c/store-locator?location=Orlando%2C%20FL%2C%20USA&latitude=28.5383832&longitude=-81.3789269
[6] https://www.costadelmar.com/en-us/stores
[7] https://www.fostergrant.com/blogs/support/find-a-retailer


www.ray-ban.com/usa/c/store-locator?location=Orlando%2C FL%2C USA&latitude=28.5383832&longitude=-81.3789269
ITEMS PURCHASED ON RAY-BAN.COM CAN BE RETURNED TO RAY-BAN, SUNGLASS HUT OR LENSCRAFTERS STORES
STORE LOCATOR
If you already have a pair of Ray-Ban Meta glasses, you can add prescription lenses at one of the authorized locations. The eligible Prescription Range for smart glasses is -6.00 to +4.00 total power.
Enter address or zip code
Orlando, FL, USA
FILTERS
Ray-Ban Store
Certified Premium Store
Certified Store
SELECT STORE WITH RAY-BAN META
SELECT STORES WITH APPOINTMENT BOOKING
SELECT STORE TO ADD PRESCRIPTION LENSES TO YOUR RAY-BAN META
Mall at Millenia RayBan
4200 Conroy Rd
Book an appointment
Orlando


www.costadelmar.com/en-us/stores
COSTA
SUNGLASSES
EYEGLASSES
APPAREL & ACCESSORIES
COSTA STORIES
CATCH IT WHILE YOU CAN: 30% OFF ALL RX LENSES
Map
Satellite
COSTA
Lockhart
Winter Park
Aloma
Ward Park
Lake Baldwin Park
Pine Hills
Barnett Park
Orlovista
BALDWIN PARK
CENTRAL BUSINESS DISTRICT
THORNTON PARK
MILK DISTRICT
Orlando
Azalea Park
MALIBU GROVES
METROWEST
RICHMOND HEIGHTS
Eagle Nest Park
Bill Frederick Park
Holden Lakes
ENGELWOOD
VENTURA
MARINER'S VILLAGE
PERSHING
HELP?




## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §

1331 because the claims under the Lanham Act (15 U.S.C. §§ 1051 *et seq*.) raise federal questions of law. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states (*i.e.,* SunTiger is a California citizen and FGX is a Delaware/Rhode Island citizen) or subjects of a foreign state (EssilorLuxottica S.A. is a French alien) and the amount in controversy exceeds $75,000 in damages. The Court also has supplemental jurisdiction over the claims arising under Florida law pursuant to 28 U.S.C. § 1367(a).

7. This Court has *in personam* jurisdiction over Defendants because they are subject to general and specific jurisdiction in this State. Defendants regularly conduct business activity in the State, sell products in the State and utilize or promote infringing trademarks in the State. In addition, FGX agreed to submit to jurisdiction and venue in this State pursuant to a written Settlement Agreement with SunTiger. (Ex. A). By virtue of FGX being a part of the Group, the EssilorLuxottica Group has agreed to the same and is subject to venue and personal jurisdiction in this District as well.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b)-(d) because, among other things, Defendants are subject to personal jurisdiction in this District, the Settlement Agreement specifies venue in Florida to resolve any disputes arising therefrom, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

9. Defendants have a long history of repeatedly violating and infringing SunTiger's intellectual property rights—including both patent and trademark rights—on SunTiger's revolutionary Eagle Eyes® blue-light-blocking sunglasses. This is merely the latest example of Defendants—the world's largest sunglass company—willful disregard of SunTiger's intellectual property rights and anticompetitive behavior.

10. The history of Eagle Eyes® sunglasses (U.S. Reg. No. 3774402) traces its roots to NASA research at the Jet Propulsion Laboratory (JPL) in the late 1960s, studying ultraviolet (invisible) and blue-light (visible) rays after discovering astronauts' eyes were damaged by harmful light in space, contributing to cataracts and age-related macular degeneration. In the 1970s, NASA Scientists replicated the unique oil droplets found in eagles' eyes and created a new, groundbreaking lens filter for astronauts' use during space missions.

11. In the 1980s, research on the harmful properties of light in space and artificial radiation from laser and welding work was conducted by JPL scientists, aiming to enhance eye protection for industrial welding applications. Their studies included findings on the eyes of birds of prey (*i.e.*, hawks and eagles), which contain oil droplets protecting against intensely

radiated light rays (blue, violet, ultraviolet) while allowing vision-enhancing light rays (red, orange, green) to pass through, reducing glare and enhancing color contrast and definition.

12. Over three years, the NASA scientists, with help from other JPL researchers, developed and commercialized a transparent welding curtain technology using light-filtering dyes and zinc oxide to absorb, filter, and scatter light, protecting eyes from harmful blue and ultraviolet radiation during welding, preventing conditions like arc eye and long-term retinal damage. Avian® and TriLenium® space-transfer lens technology was introduced to the general public and adapted for everyday use on earth. The technology, first featured in NASA Spinoff 1987, sprung from breakthrough research carried out by Jet Propulsion Laboratory (JPL) scientists, and was later documented again along with updates in NASA Spinoff 2006.

13. In the 1990s, SunTiger®, Inc., then doing business as Eagle Eyes Optics, conducted further development and improvements of the lens technology. SunTiger obtained patents on this blue-light-blocking technology including, *inter alia*, U.S. Pat. Nos. 4,878,748 ("Ultraviolet Radiation and Blue Light Blocking Polarizing Lens"); 4,952,046 ("Optical Lenses with Selective Transmissivity Functions"); 5,177,509 ("Ultraviolet Radiation and Blue Light Blocking Polarizing Lens"); and 5,400,175 ("Ultraviolet Radiation and Blue Light Blocking Polarizing Lens") (collectively, "SunTiger's Patents"), as well as

foreign counterparts throughout the world. Over time, SunTiger evolved into Eagle Eyes Optics. SunTiger has always emphasized the NASA origin in its branding, with certifications from the Space Foundation validating the space-derived technology.

14. By 1997, over $20 million had been invested in advertising EAGLE EYES® sunglasses and, to date, over $100 million has been spent in advertising Eagle Eyes® sunglasses in the United States and throughout the world, establishing it as a premium eyewear brand associated with advanced vision protection.

15. For over thirty years, Plaintiff has offered superior quality optical products throughout the United States and in foreign jurisdictions. Plaintiff became recognized as a supplier of superior quality optical products through its various product lines, including the "Eagle Eyes®" product line and the "Freedom®" product lines. Despite Plaintiff's success over the past decades, SunTiger is a small player in the eyewear market compared to Defendants, who, on information and belief, are the world's largest player and have unsurpassed market power in the industry especially due to their complete vertical integration of the business "under one roof" that includes everything from lens and frame manufacturing, distribution, advertising and sales in over 150 countries. In order to protect itself against predatory practices, Plaintiff has sought and obtained patent and trademark protection for various products

for about three decades.

16. In 2000, SunTiger sued AAI Foster Grant (now FGX), in *SunTiger, Inc. et al. v. AAI Foster Grant*, Civil Action No. 00C 7461 in the U.S. District Court for the Northern District of Illinois, for selling blue-light-blocking sunglasses that infringed SunTiger's Patents. This was the first violation of SunTiger's Intellectual Property Rights by Defendants.

17. In 2006, SunTiger earned NASA recognition as a Certified Space Technology from the Space Foundation. Kevin C. Cook, director of Space Technology Awareness for the Space Foundation, stated, "The Space Foundation is pleased to certify Eagle Eyes' lens technology for its application of this innovative technology that enhances and protects human vision."

18. In 2006, the Space Foundation honored Eagle Eyes® with its Lifetime Certification award, the only lens manufacturer granted this distinction. A NASA article also quoted Alan Mittelman, Eagle Eyes Optics President as stating, "We are most proud that the EAGLE EYES brand has become a household name to millions of customers across the world."

19. In about 2006, FGX International became the successor entity to AAI Foster Grant through acquisition, and the Foster Grant brand was absorbed into the FGX structure.

20. In 2007, SunTiger, Inc. d/b/a Eagle Eyes Optics entered into a "License Agreement" (Ex. B) with StyleMark, Inc. d/b/a Style Science, which

was a Florida corporation. The License Agreement granted rights to Stylemark to, *inter alia*, use the EAGLE EYE and EAGLE EYES® trademarks as well SunTiger's Patents. The "Licensed Products" included sunglasses that incorporated "the Trademark EAGLE EYE (or EAGLE EYES®), either as a stand-alone trademark or as used in combination with one or more trademarks of Licensee." The Licensed Territory was limited in the United States, its territories and possessions, and Canada, with respect to certain venues, marketing methods, and channels of distribution, with the balance reserved to SunTiger for its use. The Licensed Territory also included: Canada, United Kingdom, South Africa, Brazil, Italy, France, India, Australia. A royalty rate of 8-10% was required on net sales and required minimum guaranteed annual royalty payments. StyleMark agreed that it would not, during the Term of the Agreement or thereafter, make, sell, or distribute eyewear and/or sunglasses on or in connection with trademarks or brand names which were confusingly similar to the licensed trademark EAGLE EYES®, or which implied or suggested an affiliation with "NASA Space Technology" or "The Space Foundation."

21. In 2010, Plaintiff obtained U.S. Reg. No. 3774402 for the EAGLE EYES® word trademark, with a first use date of at least as early as 2001. The goods and services covered by the mark were for "Eye glasses; sports glasses; sun glasses; frames for glasses; sun glass lenses and eye glass lenses, namely,

plano and prescription sun glass lenses and eye glass lenses; eyeglass cases and pouches." SunTiger's rights in the EAGLE EYES® word trademark became incontestable under the Lanham Act due to continuous use in commerce for over five consecutive years without any adverse legal ruling affecting the validity of the mark. SunTiger holds international trademark registrations for the word mark EAGLE EYES® throughout the world.

22. In 2010, in cooperation with NASA, Eagle Eyes® was inducted into the Space Foundation Hall of Fame for its lifetime of work in space-transfer technologies that targeted both protecting eyesight and improving overall clarity and vision. The fame of EAGLE EYES® is further evidenced by its induction into the Space Technology Hall of Fame in 2010, certification as NASA-derived technology since 2009, and extensive consumer recognition as a premium eyewear brand associated with advanced vision protection, as reflected in industry awards and public endorsements.

23. In 2011, StyleMark, Inc. sought SunTiger's approval for a change of control transaction whereby FGX would acquire all of StyleMark's outstanding securities and take over the rights and obligations of the ongoing license agreement with Plaintiff. SunTiger approved this change of control, making FGX (and ultimately the Group) successors and assigns to the License Agreement.

24. In 2011, an "Amendment" to the License Agreement was executed,

requiring StyleMark or its successor to commit to the "EAGLE EYES®" brand for the 2013 season by 2012, or face termination of the agreement. If terminated, StyleMark or its successor could continue selling products branded for the 2012 season only until 2012.

25. In 2012, Eagle Eyes® sponsored the arrival of the Endeavour shuttle to a crowd of millions in Los Angeles, CA. Thereafter, Eagle Eyes® sunglasses were put on display at the Space Science Center in Los Angeles.

26. After FGX took over the StyleMark license, FGX failed to comply with the terms and conditions of the License Agreement. In essence, FGX had been selling sunglasses bearing SunTiger's trademark in violation of the parties' prior agreements. This was a flagrant violation of SunTiger's Intellectual Property Rights by Defendants.

27. In 2014, SunTiger, FGX, and StyleMark entered into a Settlement Agreement (Ex. A). It was executed on behalf of FGX and StyleMark by the same authorized representative, namely, the Executive Vice-President, General Counsel & Secretary at FGX International. Paragraph 7 of the Settlement Agreement prohibited FGX from selling or distributing eyewear or packaging bearing the "EAGLE EYE" or EAGLE EYES® names anywhere in the world. (Ex. A, p. 3, ¶7).

> 7. **<u>Non-Use of the "Eagle Eye" and "Eagle Eyes" Names</u>**. FGX shall make no further sale and/or distribution anywhere in the world of eyewear and packaging that bears, or refers to the names "Eagle Eye" or "Eagle Eyes" on the eyewear, or on any label or packaging for those products.

28. The Settlement Agreement was binding on the parties, their heirs, representatives, successors and assigns. (Ex. A, p. 5, ¶13). The Settlement Agreement included a provision for recovery of attorney's fees in the event of any breach of the Settlement Agreement. (Ex. A, p. 5, ¶11). The Settlement Agreement specified "the State of Florida" for governing law and the choice of forum. (Ex. A, p. 6, ¶19).

29. In 2014, Eagle Eyes® announced the opening of EEO International. This new division focuses on global networking and distribution in all channels. SunTiger sold its sunglasses through multiple channels of distribution, including direct online sales via its websites (<u>eagleeyes.com</u>, <u>suntiger.com</u>), retail stores, military exchanges like AAFES, wholesale partnerships, international distributors, television advertising, and direct sales. SunTiger's "Eagle Eyes®" and Freedom® products were available in over 50 countries.

30. In 2015, the U.S. Patent & Trademark Office confirmed that SunTiger's Eagle Eyes® trademark (U.S. Reg. No. 3774402) had become incontestable under the Lanham Act (15 U.S.C. § 1065). This status strengthened the mark's legal protections, making it "conclusive evidence" of

the SunTiger's exclusive right to use the mark nationwide for the specified goods/services.

31. In 2016, Plaintiff also obtained U.S. Registration No. 4944309 for the word mark FREEDOM® in connection with "Eyeglass frames; Eyeglass lenses; Eyeglasses; Eyewear; Spectacles; Sunglasses." Plaintiff's rights in the FREEDOM® mark are valid and continuing and the mark is incontestable.

32. In 2017, Eagle Eyes® partnered with Operation Gratitude by providing glasses to active military, veterans, and first responders and others in need.

33. In 2018, Essilor and Luxottica merged to form EssilorLuxottica, S.A., which started doing business as the EssilorLuxottica Group (or the Group), which was a single, vertically integrated enterprise that brought together frames and lenses under one roof by the power of vertical integration and controlled everything from manufacturing of prescription and non-prescription lenses as well as frames, distribution, advertising, online sales, and retail sales throughout the world.

34. Plaintiff has long maintained advantageous business relationships with military exchanges worldwide, including AAFES, through ongoing sales and buyer contracts. As a direct competitor in eyewear sales to U.S. military exchanges and bases, the EssilorLuxottica Group, on information and belief, engaged in a pattern of conduct to eliminate competition, including Plaintiff,

by leveraging the Group's superior economic strength and product variety to convince buyers to reduce purchases of SunTiger's eyewear and shift to exclusive offerings of Group brands. Defendants had knowledge of these relationships through market competition and intentionally interfered without justification, using dominance to demand product removal and impose exclusive dealings. This caused Plaintiff damages, such as lost sales (e.g., from 192 AAFES Purchase Orders in 2021) dropping to near zero and market exclusion.

35. For many years prior to 2022, SunTiger held a strong, exclusive position in the AAFES retail environment, selling its Eagle Eyes® and Freedom® branded sunglasses in stores and on the AAFES worldwide website. Its products enjoyed a distinct market presence, without direct replication by third-party vendors like those in the EssilorLuxottica Group, building significant brand equity and loyalty among military personnel and their families.

36. In or around 2020, Ms. Jennifer Dow was appointed head buyer for AAFES's sunglasses category, following a similar role at Neiman Marcus in Dallas, Texas. During an in-person meeting at AAFES headquarters attended by SunTiger's CEO and Senior Marketing Director, Dow stated that her Neiman Marcus experience involved extensive support from the EssilorLuxottica Group, including inventory planning, purchasing, new

product introductions, stock exchanges, and product removals. She implied her AAFES appointment was recommended or solicited by someone within the EssilorLuxottica Group, based on her prior handling of their brands.

37. After her appointment, and despite multiple meetings with SunTiger representatives, Dow deprioritized SunTiger's Eagle Eyes® and Freedom® brands. She shifted numerous SKUs from regular replenishment orders to an "as-needed" or "one-time buy" basis, even with sustained demand, leading to low inventory, reduced sales, and understocking at high-demand locations. Between 2020 and 2022, SunTiger was also repeatedly denied in-store advertising opportunities at AAFES, allegedly due to space constraints and prior commitments favoring brands like Oakley (owned by EssilorLuxottica) and other Luxottica-affiliated products.

38. The start date of sales of the "Costa Del Mar Freedom Series" and or "Freedom Series" sunglasses is unknown. The Group launched Costa Del Mar's "Freedom Series" sunglasses, which included, *inter alia*, "Freedom Series" Reefton (6S9007), "Freedom Series" Peli (6S4002), "Freedom Series" Spearo (6S9008), "Freedom Series" Panga (6S9037), "Freedom Series" Diego, "Freedom Series" Fantail (6S9006), and "Freedom Series" Reefton "Freedom Series" Polarized Blue Mirror 580G Rectangular (06S9007 900734 64). Sales of these "Freedom Series" sunglasses were not authorized by SunTiger and at all times the sales were in direct competition with SunTiger's sales of its

sunglasses and in violation of SunTiger's FREEDOM® trademark. This was yet another violation of SunTiger's Intellectual Property Rights by Defendants. The Group's sales of the infringing "Freedom Series" sunglasses are still ongoing as of today.




39. The start date of sales of the unauthorized Ray-Ban sunglasses using the "Eagle Eye" mark is unknown. According to the Internet Archive, the Group started selling unauthorized Ray-Ban sunglasses using the "Eagle Eye" mark as early as 2021, but the Group has told SunTiger that the sales did not commence until 2023. Sales of these "Eagle Eye" sunglasses were not authorized by SunTiger and at all times the sales were in direct competition with SunTiger's sales of its sunglasses and in violation of SunTiger's EAGLE EYES® trademark (in the United States and throughout the world) and the

world wide prohibition against using the term "Eagle Eye" or "Eagle Eyes" on sunglasses anywhere in the world under the Settlement Agreement prohibition. This was yet another flagrant violation of SunTiger's Intellectual Property Rights by Defendants.




40. In 2022, Eagle Eyes® introduced the new Freedom® Apollo – a high protection polarized lens in a luxurious 22k Gold finished aviator frame. This special edition model was dedicated to the Apollo astronauts and their historic lunar missions.

41. In 2022, Ms. Dow placed the largest single bulk order in AAFES history for SunTiger's Eagle Eyes® and Freedom® products, totaling over

$200,000. However, rather than allocating inventory based on store performance or demand, the products were distributed evenly across all AAFES store locations, leading to overstocking in low-volume stores and understocking in high-volume ones. Within six months, SunTiger was placed on hold due to purported poor sell-through, an outcome attributable to this flawed distribution strategy. This timing coincided with the announcement and implementation of Sunglass Hut's (a brand owned and operated by the EssilorLuxottica Group) entry into the same AAFES retail footprint, raising concerns of collusion, preferential treatment, and unfair competition to favor Defendants' brands.

42. Shortly thereafter, Ms. Dow was reassigned to another division within AAFES. Her successor interpreted SunTiger's position as one of excessive stagnant inventory and lack of demand, requesting markdowns and liquidation strategies instead of reallocating stock to interested high-volume stores. Although SunTiger proposed reallocation, resolution took approximately 6-9 months, during which time SunTiger's products were removed from multiple AAFES store locations and the AAFES worldwide online platform. SunTiger's in-store SKU count was further reduced from 25 to 12 (and currently stands at 9), without clear justification, despite SunTiger's substantial investments in inventory and marketing based on prior representations from AAFES buyers that the 2022 order signaled continued

growth for 2023 and beyond.

43. The Group's sales of the infringing "Eagle Eye" sunglasses are still ongoing as of today. For example, Sunglass Hut is an EssilorLuxottica company and part of the Group, which explains on its web site that "[t]he Group boasts a widespread brick and mortar retail network with top-tier banners, such as LensCrafters, Target Optical and Pearle Vision in North America … as well as global banners, such as Sunglass Hut, Ray-Ban ...The Group's brick and mortar network is complemented by leading e-commerce platforms, like Ray-Ban.com … [and] SunglassHut.com." And the Sunglass Hut is currently selling infringing "Eagle Eye" sunglasses as illustrated below. At all times the sales were in direct competition with SunTiger's sales of its sunglasses. These ongoing willful sales constitute yet another flagrant violation of SunTiger's Intellectual Property Rights.




44. On information and belief, Defendant EssilorLuxottica S.A.'s (and the Group's) actions formed part of a broader pattern of anticompetitive and monopolistic behavior in the eyewear industry, as evidenced by multiple ongoing investigations and lawsuits. In the United States, consumers filed class actions in 2024 alleging violations of the Sherman and Clayton Acts through monopoly control of over 80% of the premium-branded eyewear market, maintained via vertical integration, exclusive dealings, bundled sales,

and discriminatory pricing that foreclosed competitors like Plaintiff, with EssilorLuxottica seeking dismissals in 2024. Globally, the Group faced antitrust scrutiny, including the European Commission's Phase II investigations into the 2018 Essilor-Luxottica merger for tying risks between lenses and frames, a 2022 acquisition probed for vertical foreclosure effects, and a Chilean investigation into market concentration. Additionally, the 2023 Turkish Competition Authority decision fined EssilorLuxottica S.A. for abusing dominance through bundling and discriminatory terms, with effects continuing into 2024 via appeals. This pattern includes exclusive dealings paralleling the AAFES exclusion here, where Defendants used market power to force buyers to favor their brands.

45. On information and belief, these actions were not coincidental but part of a coordinated strategy by Defendants, through their influence over AAFES buyers and their vertically integrated control of the eyewear market, to diminish SunTiger's presence, exclude its products from key military retail channels, and promote their own brands, constituting unfair competition, anticompetitive practices, and interference with SunTiger's established business relationships in violation of Florida law and the implied covenant of good faith and fair dealing inherent in prior agreements between the parties. In 2025 correspondence, SunTiger demanded reinstatement of its AAFES access and an end to exclusionary practices, but the Group did not comply.

46. EssilorLuxottica S.A. is liable for its own actions as well as those of the EssilorLuxottica Group under a single enterprise and d/b/a theory under the Lanham Act, treating the Group as a unified entity due to centralized control, integrated value chain from design to e-commerce, and shared governance, making S.A. liable for the collective infringement and breaches.

47. EssilorLuxottica S.A. is liable for its own actions as well as those of the EssilorLuxottica Group under an alter ego / veil-piercing theory because FGX and the Group are mere instrumentalities dominated by EssilorLuxottica S.A., with shared resources, centralized logistics, and no meaningful independence (*e.g.,* leveraging the Group's global networks in over 150 countries), used for improper purposes such as evading intellectual property obligations under the Settlement Agreement (explain infra) by infringing through Ray-Ban (and Costa Del Mar) while hiding behind corporate formalities, causing injury to Plaintiff.

48. EssilorLuxottica S.A. is liable for its own actions as well as those of the members of the EssilorLuxottica Group under an agency theory as subsidiaries within the Group operate under EssilorLuxottica S.A.'s direction, and manufacturing and distributing infringing products pursuant to the Group's vertically integrated strategy and corporate organization "under one roof," which it admits to the public, showing 100% ownership and control and consolidation.

**COUNT I**

**LANHAM ACT VIOLATIONS (15 U.S.C. §§ 1114, 1125(a))**

49. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

50. Defendants' unauthorized use of "Eagle Eye" and "Freedom Series" on sunglasses and advertising media, constitutes trademark infringement under 15 U.S.C. § 1114(1), false designation of origin and unfair competition under 15 U.S.C. § 1125(a), and dilution under 15 U.S.C. § 1125(c).

51. SunTiger owns valid and incontestable U.S. registrations for EAGLE EYES® (Reg. No. 3774402) and FREEDOM® (Reg. No. 4944309), with first use dates predating Defendants' infringement, covering eyewear goods identical to the Infringing Products.

52. The EAGLE EYES® mark is famous and distinctive due to decades of NASA-associated branding, over $100 million in advertising, global sales in over 50 countries, and Space Foundation certifications.

53. Defendants used confusingly similar marks in commerce on identical goods, creating a likelihood of confusion or reverse confusion.

54. On information and belief, the infringement is willful, as Defendants had actual knowledge through FGX's prior disputes, the 2014 Settlement Agreement's worldwide prohibition, continued sales post notice,

refused to recall inventory after notice of infringement, and continued sales through today. Post-filing continued sales by the Group will be further evidence of willfulness. Further despite being an extremely sophisticated company with over 20,000 trademarks and pending registrations, the Group failed to perform any clearance searches prior to adopting SunTiger's registered trademarks. Willfulness entitles SunTiger to enhanced remedies under 15 U.S.C. § 1117(a).

55. SunTiger suffered irreparable harm, including lost sales, goodwill dilution, and market exclusion, entitling it to injunctions, actual damages, treble damages for willfulness, corrective advertising, and attorneys' fees.

## COUNT II

## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

56. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

57. The 2014 Settlement Agreement is a valid, enforceable contract under Florida law, binding on Defendants as successors and assigns via FGX's acquisition and the 2018 merger, prohibiting worldwide use of "Eagle Eye" or "Eagle Eyes" on eyewear.

58. Defendants materially breached by manufacturing, distributing, and selling unauthorized "Eagle Eye" and "Freedom Series" sunglasses.

59. Defendants also breached the implied covenant of good faith and fair dealing by frustrating the Agreement's purpose through evasion of liability via corporate structure, continued infringement, AAFES interference, and anticompetitive acts excluding SunTiger from markets.

60. The breaches caused damages, including lost sales, lost profit, lost royalties market exclusion losses, and attorneys' fees per the Settlement Agreement.

**COUNT III**

**UNFAIR COMPETITION (FLORIDA COMMON LAW)**

61. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

62. Defendants engaged in deceptive and unfair acts, including unauthorized use of confusingly similar marks on identical goods, false advertising implying NASA-like technology, AAFES interference via exclusionary practices, and market dominance to foreclose competition.

63. These acts caused a likelihood of confusion and actual deception, as shown by consumer feedback associating Infringing Products with SunTiger's marks, leading to diverted sales and goodwill dilution.

64. Acts were immoral, unethical, oppressive, and unscrupulous, violating fair competition principles and paralleling global antitrust findings

against the Group.

65. SunTiger suffered damages and irreparable harm, including lost profits from reduced AAFES orders (192 in 2021 to near zero by 2023-2025) and market exclusion.

## PRAYER FOR RELIEF

Wherefore, Plaintiff SunTiger, Inc. d/b/a Eagle Eyes Optics prays that this Court enter such preliminary and final orders and judgments as are necessary to provide Plaintiff with the following requested relief:

A. That Defendants, and all of their respective agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, and/or under authority from Defendants, or in concert or participation with Defendants, be enjoined preliminarily and permanently by this Court, from:

- using any trademark, service mark, name, logo, domain name, social media name, design and/or source designation of any kind in connection with Defendants' goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar in any way, to Plaintiff's EAGLE EYES® or FREEDOM® marks, including but not limited to "Eagle Eye" or "Freedom Series";

- using any trademark, service mark, name, logo, domain name, social media name, design and/or source designation of any kind in connection with Defendants' goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods are sponsored or authorized by Plaintiff or that Plaintiff's goods are affiliated or authorized by Defendants;

- continuing any and all such acts of unfair competition as alleged in this action, including anticompetitive practices, market exclusion, or interference with Plaintiff's business relationships;

- interfering with Plaintiff's ability to sell its sunglasses through the AAFES or any other military exchanges, including by imposing exclusive dealings, demanding product removal, or using market dominance to favor Group brands; and

- manufacturing, distributing, advertising, offering for sale, or selling any Infringing Products worldwide, and requiring Defendants to recall and destroy all infringing inventory from all channels, including third-party retailers.

B. That Plaintiff be awarded all damages caused by the acts forming the basis of this action, including:

- actual damages for lost sales, profits, lost royalties, and goodwill dilution;

- treble damages under Lanham Act §1117(a) for willful infringement;

- punitive damages based on Defendants' willful and deliberate infringement, unfair competition, tortious interference, and anticompetitive harm, to deter such conduct in the future; and

- compensation for corrective advertising to remedy damage to Plaintiff's goodwill.

C. That Defendants be required to pay to Plaintiff the costs of this action and Plaintiff's reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a) and the Settlement Agreement's prevailing-party provision.

D. That Defendants be required to pay prejudgment interest on all damages and profits awards.

E. Such other and further relief as this Court deems just and proper.

**JURY TRIAL REQUEST**

Plaintiff requests a trial by jury as to all matters so triable.

Respectfully submitted September 8, 2025.

By: */s/ Brian R. Gilchrist*
Brian R. Gilchrist
FL Bar No. 774065
bgilchrist@allendyer.com

Ryan T. Santurri
FL Bar No. 015698
rsanturri@allendyer.com

Trevor F. Ward
FL Bar No. 1031171
tward@allendyer.com

**ALLEN, DYER, DOPPELT + GILCHRIST, PA**
255 South Orange Avenue, Suite 1401
Orlando, Florida 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

***Attorneys for Plaintiff***